**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>Prime Core Technologies, Inc., *et al.,*[1]<br><br>               Debtors. | Chapter 11<br><br>Case No. 23-11161 (JKS)<br><br>(Jointly Administered) |
| PCT Litigation Trust,<br><br>               Plaintiff,<br><br>     v.<br><br>Zap Solutions, Inc. d/b/a Strike,<br><br>               Defendant. | Adv. Proc. No. 26-50200 (JKS) |

**MEMORANDUM OF LAW IN SUPPORT OF
ZAP SOLUTIONS, INC.'S MOTION TO DISMISS THE COMPLAINT
<u>PURSUANT TO FED. R. CIV. P. 12(b)(6) AND FED. R. BANKR. P. 7012(b)</u>**

**COVINGTON & BURLING LLP**
Dianne F. Coffino (admitted *pro hac vice*)
Mark P. Gimbel (admitted *pro hac vice*)
Martin E. Beeler (admitted *pro hac vice*)
Julia Blackburn (admitted *pro hac vice*)
30 Hudson Yards
New York, NY 10001
Tel.: (212) 841-1000
E-mail:  dcoffino@cov.com
        mgimbel@cov.com
        mbeeler@cov.com
        jblackburn@cov.com

**COLE SCHOTZ P.C.**
Patrick J. Reilley (No. 4451)
Carol E. Thompson (No. 6936)
500 Delaware Avenue
Suite 600
Wilmington, DE 19801
Tel.: (302) 652-3131
E-mail:  preilley@coleschotz.com
        cthompson@coleschotz.com

---

[1]     The debtors in the chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528) (collectively, "<u>Debtors</u>"). The Debtors' service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, Nevada 89135.

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................................... 1

NATURE AND STAGE OF PROCEEDING .................................................................... 4

SUMMARY OF ARGUMENT ......................................................................................... 5

BACKGROUND ............................................................................................................... 7

      A.    Prime Trust Business Operations.................................................................. 7

      B.    Zap's Business and Role as Integrator......................................................... 8

      C.    Zap-Prime Trust Contracts........................................................................... 9

      D.    Prime Trust Chapter 11 Filing ................................................................... 12

LEGAL STANDARD FOR DISMISSAL........................................................................ 12

ARGUMENT ................................................................................................................... 14

      A.    The Alleged Transfers Were Not Transfers of Prime Trust's Property................ 14

           1.    Article 8 Defines Prime Trust and Zap's Rights in Custodial Property................................................................................. 15

           2.    The Parties' Relationship Meets the Requirements of Article 8.............. 15

                 a.    Prime Trust and Zap Elected to Treat All Custodial Property as "Financial Assets" Subject to Article 8. ................... 16

                 b.    Prime Trust Maintained "Securities Accounts" as a "Securities Intermediary."............................................................. 17

                 c.    The Complaint Confirms that Zap and its Customers are "Entitlement Holders" Under Article 8........................................ 20

           3.    Under Article 8, the Financial Assets Custodied with Prime Trust Were Not Its Property Regardless of Commingling. ............................... 21

           4.    Application of Article 8 is not Contrary to the Distribution Opinion. .................................................................................................. 23

      B.    The Complaint Fails to Adequately Allege Other Required Elements of a Preference Claim.......................................................................................... 25

           1.    The Complaint Fails to Identify the Recipient of Each Transfer............. 25

i

2.      The Complaint is Devoid of any Factual Allegations Showing that the Alleged Transfers Were for Zap's Benefit............................................ 26

3.      The Complaint Fails to Allege Facts Showing Zap Was a Creditor......... 27

4.      The Complaint Fails to Plead That the Alleged Transfers Were Made on Account of Antecedent Debt..................................................... 28

CONCLUSION............................................................................................................... 30

## TABLE OF AUTHORITIES

**Cases**                                                 **Page(s)**

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ...................................................................................................13

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ...................................................................................................12

*Begier v. I.R.S.,*
496 U.S. 53 (1990) ...............................................................................................23, 30

*In re BMT–NW Acquisition, LLC,*
582 B.R. 846 (Bankr. D. Del. 2018) ...........................................................................27

*Butner v. United States,*
440 U.S. 48 (1979) .....................................................................................................15

*In re Cardon Realty Corp.,*
146 B.R. 72 (Bankr. W.D.N.Y. 1992) .........................................................................26

*City of Farrell v. Sharon Steel Corp.,*
41 F.3d 92 (3d Cir. 1994) ...........................................................................................23

*Claybrook v. Bear Growth Cap. Partners, LP (In re WBE, LLC),*
2011 WL 2607090 (Bankr. D. Del. June 30, 2011) .....................................................25

*Claybrook v. Consol. Foods, Inc. (In re Bake-Line Grp., LLC),*
359 B.R. 566 (Bankr. D. Del. 2007) ...........................................................................27

*In re Compton Corp.,*
831 F.2d 586 (5th Cir. 1987), *on reh'g*, 835 F.2d 584 (5th Cir. 1988)........................26

*In re Crucible Materials Corp.,*
2011 WL 2669113 (Bankr. D. Del. July 6, 2011)........................................................29

*Edney v. Haliburton,*
658 F. App'x 164 (3d Cir. 2016) .................................................................................12

*Flener v. Alexander (In re Alexander),*
429 B.R. 876 (Bankr. W.D. Ky. 2010), *aff'd*, 2011 WL 9961118 (6th Cir.
Dec. 14, 2011).............................................................................................................16

*In re FTX Trading Ltd.,*
676 B.R. 131 (Bankr. D. Del. 2025) ...........................................................................26

*Geller v. Coltec Indus., Inc. (In re Crucible Materials Corp.)*,
   2012 WL 5360945 (Bankr. D. Del. Oct. 31, 2012) ...............................................26

*Gladstone v. Bank of Am., N.A. (In re Vassau)*,
   499 B.R. 864 (Bankr. S.D. Cal. 2013) ....................................................................26

*Hall v. Ford Motor Credit (In re JKJ Chevrolet, Inc.)*,
   412 F.3d 545 (4th Cir. 2005) ..................................................................................15

*Insolvency Servs. Grp., Inc. v. Comcast Cable Commc'ns, LLC*,
   2021 WL 4477000 (D. Del. Sep. 30, 2021) ............................................................25

*James Cable, LLC v. Millennium Digital Media Sys., LLC (In re Broadstripe, LLC)*,
   435 B.R. 245 (Bankr. D. Del. 2010) .......................................................................13

*In re Liquid Holdings Grp., Inc.*,
   2018 WL 6841351 (Bankr. D. Del. Nov. 14, 2018) ................................................29

*Lutz v. Portfolio Recovery Assocs., LLC*,
   49 F.4th 323 (3d Cir. 2022) ...............................................................................13, 28

*Mayer v. Belichick*,
   605 F.3d 223 (3d Cir. 2010)....................................................................................13

*In re Messina*,
   687 F.3d 74 (3d Cir. 2012)......................................................................................15

*Miller v. Easy Star Records (In re DA Liquidating Corp.)*,
   622 B.R. 172 (Bankr. D. Del. 2020) ............................................................13, 28, 29

*Miller v. Welke* (*In re United Tax Grp., LLC*),
   2016 WL 7235622 (Bankr. D. Del. Dec. 13, 2016)................................................25

*In re Quantum Foods, LLC*,
   558 B.R. 111 (Bankr. D. Del. 2016) .......................................................................29

*Stanziale v. DMJ Gas-Marketing Consultants, LLC (In re Tri-Valley Corp.)*,
   2015 WL 110074 (Bankr. D. Del. Jan. 7, 2015)......................................................29

*In re Tweeter Opco*,
   452 B.R. 150 (Bankr. D. Del. 2011) .......................................................................28

*Walsh v. Cobaugh (In re Riverside Supply, Inc.)*,
   58 B.R. 661 (Bankr. W.D. Pa. 1986) ......................................................................30

*Wells Fargo Bank, N.A. v. Est. of Malkin*,
   278 A.3d 53 (Del. 2022) .........................................................................................16

**Statutes**

11 U.S.C. § 547(b) ...............................................................................................1, 4, 14, 26

11 U.S.C. § 547(b)(1) ........................................................................................................14

11 U.S.C. § 547(b)(2) ........................................................................................................14

11 U.S.C. § 550(a)(1)......................................................................................................5, 26

Fed. R. Bankr. P. 7008 .......................................................................................................5

Fed. R. Bankr. P. 7010 .......................................................................................................9

Fed. R. Bankr. P. 7012 .......................................................................................................1

Fed. R. Bankr. P. 7012(b) ..................................................................................................5

Fed. R. Bankr. P. 7012(b)(6) ............................................................................................12

Fed. R. Civ. P. 12(b)(6)......................................................................................................1

NRS § 104.8102(1)(i) ........................................................................................................21

NRS § 104.8102(1)(h) ..................................................................................................18, 20

NRS § 104.8102(1)(j)(3)....................................................................................................16

NRS § 104.8102(1)(m) ................................................................................................17, 19

NRS § 104.8102(1)(p) ........................................................................................................20

NRS § 104.8501(1) .............................................................................................18, 19, 20, 24

NRS § 104.8501(2) ........................................................................................................20, 24

NRS § 104.8501(2)(a)........................................................................................................21

NRS § 104.8503(1) ..........................................................................................................2, 22

NRS § 104.8503(2) .............................................................................................................22

NRS § 104.8504.................................................................................................................21

NRS § 104.8507.................................................................................................................20

UCC § 8-102, cmt. 1 ...........................................................................................................3

UCC § 8-102, cmt. 9 .........................................................................................................17

UCC § 8-102, cmt. 14 .................................................................................................3, 17

UCC § 8-102, cmt. 18 ..................................................................................................17

UCC § 8-103, cmt. 1 ....................................................................................................16

UCC § 8-501, cmt. 1 ....................................................................................................18

UCC § 8-501, cmt. 3 ....................................................................................................21

UCC § 8-503, cmt. 1 ..................................................................................2, 12, 22, 24

UCC § 8-503, cmt. 2 ..............................................................................................22, 24

UCC § 8-504, cmt. 1 ..............................................................................................12, 22

UCC § 9-306(4) ...........................................................................................................15

**Other Authorities**

*Federal Deposit Ins. Corp.*, *Recordkeeping for Custodial Accounts*, 89 Fed. Reg.
    80135, at 80140-41 (Oct. 2, 2024) ........................................................................10

James Steven Rogers, *Policy Perspectives on Revised U.C.C. Article 8,* 43 UCLA
    L. Rev. 1431 (1996) .......................................................................2, 20, 22, 24, 29

Jeanne L. Schroeder, *Is Article 8 Finally Ready This Time? The Radical Reform
    of Secured Lending on Wall Street*, 1994 Colum. Bus. L. Rev. 291 (1994)...........................17

Local Rule 7008-1.........................................................................................................5

Local Rule 7012-1.........................................................................................................5

Russell A. Hakes, *UCC Article 8: Will the Indirect Holding of Securities Survive
    the Light of Day*, 35 Loy. L.A. L. Rev. 661 (2002) ...............................................22

*Undertaking*, *Black's Law Dictionary* (12th ed. 2024).................................................18

*Undertaking*, *Merriam-Webster*, https://www.merriam-
    webster.com/dictionary/undertake; ......................................................................18

Pursuant to Federal Rule of Civil Procedure 12(b)(6), made applicable herein by Rule 7012 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), defendant Zap Solutions, Inc. d/b/a Strike ("Zap") respectfully submits this memorandum of law in support of its Motion to Dismiss the Complaint ("Complaint" or "Compl.") filed by PCT Litigation Trust ("PCT").

## PRELIMINARY STATEMENT

At the inception of their relationship, Prime Trust LLC ("Prime Trust") and Zap, two sophisticated commercial parties, made a deliberate choice that forecloses PCT's preference claim against Zap. In the contract governing their custodial arrangement, Prime Trust and Zap agreed that their relationship would be governed by Article 8 of the Nevada Uniform Commercial Code ("Article 8").[2] Specifically, the parties agreed that Article 8 would define ownership of the bitcoin and fiat currency ("financial assets" under Article 8) that Prime Trust held as custodian (a "securities intermediary") for Zap and its customers ("entitlement holders"). The result of this election is clear: the assets Prime Trust held belonged to Zap and its customers, were *never* Prime Trust's property, and cannot be reached by Prime Trust's creditors. Under Article 8, this is true even if the assets were commingled in fungible bulk, and even though Prime Trust ultimately became insolvent. Because the assets at issue were not Prime Trust's property, PCT cannot satisfy the threshold requirement for a preference claim under section 547(b) of the Bankruptcy Code and the Complaint should be dismissed with prejudice.

Prime Trust was an intermediary, one that claimed it was "a critical and necessary component of the digital asset ecosystem."[3] It held bitcoin ("BTC") and fiat currency ("Fiat") on behalf of Zap and Zap's customers. In the Custodial Agreement (defined below) that governed the

---

[2]    Adopted by Nevada at NRS §§ 104.8101 *et seq*.

[3]    Declaration of Jor Law, Interim Chief Executive Officer and President of Prime Core Technologies Inc., *et al*., in Support of Chapter 11 Petitions and First Day Motions [D.I. 14] ("Law Decl."), ¶ 38.

custodial function of their relationship, Prime Trust and Zap *expressly* elected to have Article 8 apply to the BTC and Fiat that Prime Trust held as a custodian:

> Customer is an "Entitlement Holder" in a "Financial Asset," as defined by, and for purposes of the Uniform Commercial Code, including Article 8 thereto, as adopted and implemented in accordance with Nevada law ("UCC"). Applicable Custodial Property are "Financial Assets" for purposes of the UCC and are not assets of Prime Trust.[4]
>
> ***
>
> APPLICATION OF UCC. Except as otherwise provided under Applicable Law, the Parties agree the relationship between Prime Trust and Customer is governed by Article 8 of the UCC and that for the purposes of this Service Schedule: Customer is an "entitlement holder" and any Custodial Property will be treated as a "Financial Asset" within the meaning of Nevada Revised Statutes ('NRS') 104.8102(h) and (j).[5]

The Custodial Agreement defined "Custodial Property" as "any property delivered by Customer into the possession or control of Prime Trust," and prescribed that "Customer owns *all Custodial Property* held by Prime Trust on behalf of [the] Customer."[6]

This contractual language is not boilerplate buried in fine print. It was the contractual architecture that the parties chose to govern in the event of Prime Trust's collapse. Prime Trust's failure is precisely the type of scenario that Article 8 was designed to address: a custodian collapses, and the statute ensures consumer assets remain with its customers, not with the custodian's creditors.[7]

---

[4]     Compl., Ex. B, Custodial Agreement, § 3.1(a).

[5]     *Id.*, § 6.

[6]     Custodial Agreement, §§ 1, 2.9.

[7]     NRS § 104.8503(1) ("financial asset[s] . . . are not the property of the securities intermediary and are not subject to claims of creditors of the securities intermediary"); UCC § 8-503, cmt. 1 ("[S]ecurities that a [securities intermediary] holds for its customers are not general assets of the firm subject to the claims of creditors."); James Steven Rogers, *Policy Perspectives on Revised U.C.C. Article 8*, 43 UCLA L. Rev. 1431, 1517 (1996) ("Revised Article 8 . . . ensures that entitlement holders do not take the credit risk of their intermediary.").

To hold otherwise would ignore the critical role that Article 8 plays in facilitating the custody of financial assets. The modern financial system is built on the foundation of Article 8 and the premise that an intermediary custodian can hold financial assets on behalf of many customers simultaneously, without requiring customers to relinquish their ownership interests. This bedrock legal structure adopted in every U.S. jurisdiction provides the framework through which trillions of dollars of retirement savings, institutional investments, and individual wealth are bought, sold and held daily. Without it, no rational person could entrust their assets to an intermediary, and the modern financial system would not function.

Applying Article 8's provisions to cryptocurrency is not novel. Article 8 is intended to be "flexible[,] to cover the wide variety of investment products that now exist or may develop."[8] As amended, the statute addresses cryptocurrency directly, acknowledging that "a cryptocurrency exchange that holds cryptocurrencies (and not securities) for customers might be a securities intermediary."[9] The statutory text thus makes clear that the same legal principles that govern the rights of customers of other intermediaries can and should be applied to cryptocurrency where the parties elect to have Article 8 govern their relationship.

Article 8 and Prime Trust's own agreements demonstrate that customers—*not* Prime Trust—owned all of the assets at issue in this litigation at all relevant times. As a result, PCT cannot meet its burden of demonstrating that the transfers alleged in the Complaint were transfers of an interest in Prime Trust property—a threshold requirement for any preference claim. This is a material defect that cannot be cured by amendment and requires dismissal with prejudice.

---

[8]    UCC § 8-102, cmt. 1.

[9]    UCC § 8-102, cmt. 14.

This result is not at odds with the Court's Distribution Opinion [D.I. 1086]. Zap's rights were expressly carved out of that ruling. And the Distribution Opinion in any event did not address Article 8 because no objecting customer raised it. Instead, it applied common-law trust principles under which tracing is required. These principles do not apply to Zap, whose relationship with Prime Trust is governed by Article 8—a distinct statutory regime that operates by a different rule. Article 8 presumes commingling, requires no tracing, and provides that entitlement holders retain their property interest in the financial assets held by a custodian on their behalf. It thus leads to an entirely different outcome.

Article 8 is sufficient to dispose of PCT's preference claims on its own. But the Complaint also fails to state a claim because it does not plead other essential elements of a preference claim. The Complaint (a) does not identify the recipient, much less the transferee, of each transfer; (b) is devoid of any factual allegations that would support the conclusion that the transfers were made for the benefit of Zap; (c) lacks factual allegations showing that Zap was a creditor of Prime Trust for purposes of the transfers; and (d) fails to show that the transfers were transfers made on account of antecedent debt. Because each of these elements is essential to any preference claim, the Complaint must be dismissed.

**NATURE AND STAGE OF PROCEEDING**

On March 2, 2026, PCT filed the Complaint against Zap, commencing this adversary proceeding. The Complaint contains three Counts. In Count I, PCT seeks to avoid, under section 547(b) of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq*. ("Bankruptcy Code"), alleged transfers of $29,481,000.99 in Fiat and 1,939.50 BTC (together with the Fiat transfers, "Alleged Transfers") that PCT alleges were made by Prime Trust "to or for the benefit of" Zap.[10]

---

[10]     *See* Compl., ¶¶ 2, 115, 256–66 and n.17.

4

In Count II, after crediting Zap with subsequent new value provided to Prime Trust,[11] PCT seeks to recover, pursuant to section 550(a)(1) of the Bankruptcy Code, not less than $13,877,147.36 in Fiat and 1,758.18 BTC from Zap as either the initial transferee or the person for whose benefit the transfers were made.[12] In Count III, PCT seeks to disallow claims filed by Zap in the Debtors' chapter 11 cases unless and until Zap pays the value of the Alleged Transfers to PCT.[13] Counts II and III of the Complaint are derivative of Count I. If Count I is dismissed, Counts II and III must be dismissed as well.[14]

## SUMMARY OF ARGUMENT

The Complaint filed by PCT against Zap is deficient on numerous grounds. Most critically, PCT cannot establish that the Alleged Transfers were transfers of Prime Trust's property—a threshold requirement for any preference claim. Prime Trust's relationship with Zap is governed by *state* law—the usual basis for determination of property ownership—and, in particular, by Article 8, which the parties agreed would control their relationship. The parties adopted Article 8 precisely to ensure that Zap and its customers ("entitlement holders" under the UCC) would retain ownership of any property they delivered to Prime Trust (a "securities intermediary" under the UCC). PCT cannot now upend that commercial agreement by arguing that the Alleged Transfers were transfers of Prime Trust property.

---

[11]    Plaintiff alleges that following receipt of the Alleged Transfers, Zap transferred $15,603,853.63 in Fiat and 181.32 BTC in subsequent new value to Prime Trust. *See id.*, ¶¶ 5, 115.

[12]    *Id.*, ¶¶ 267–69.

[13]    *Id.* at 1 and ¶¶ 270–72.

[14]    In accordance with Bankruptcy Rules 7008 and 7012(b) and Local Rules 7008-1 and 7012-1, Zap states that it does not consent to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

In an effort to disregard the parties' agreement and prevail under common law trust principles, PCT devotes much of the Complaint to factual allegations purportedly showing that financial assets held by Prime Trust were commingled and cannot be traced. But Article 8, *not* common law trust principles, governs Prime Trust's relationship with Zap. And under Article 8, it makes no difference whether the assets in question were commingled by Prime Trust. Article 8, in fact, presumes commingling—financial assets held by securities intermediaries are typically held in bulk and thus, by definition, are commingled with the financial assets of other customers and with the property of the securities intermediary itself. Article 8 makes clear that—despite any such commingling—custodial assets remain the property of the entitlement holder and are not subject to claims of creditors of the securities intermediary. Because PCT cannot establish that the Alleged Transfers were transfers of Prime Trust's interest in property under these controlling provisions of Article 8, its preference claim fails.[15]

While the absence of a property interest is reason enough to dismiss this action, the Complaint also fails to plead facts to support other required elements for a preference claim. As explained in detail below, PCT: (a) fails to identify the recipient of each of the Alleged Transfers;[16] (b) provides no factual basis for the conclusory allegation that the Alleged Transfers were made

---

[15]    *See infra*, Argument, Section A.

[16]    Zap is not alone in raising the issue of PCT's failure to list the recipient of each allegedly preferential transfer. *See, e.g.*, Def. Bosonic, Inc.'s Mem. Law. Supp. Mot. Dismiss ¶ 7, *PCT Litigation Trust v. Bosonic, Inc.*, No. 25-52031 ("The declaration supporting the Complaint also omits from its Exhibit 4 the 'Actual Withdrawer' column, which identifies the End Users who received the Transfers."); Mem. Law Def. Brian Overly Supp. Mot. Dismiss ¶ 36, *PCT Litigation Trust v. Applegate*, No. 25-52047 (Bankr. D. Del. Feb. 12, 2026) (the complaint "does not plausibly allege . . . who is the alleged transferee"); Mem. Law Defs. Oval Labs, Inc. and Oval Finance, LLC Supp. Mt. Dismiss at 16, *PCT Litigation Trust v. Oval Labs, Inc.*, No. 25-50438 (Bankr. D. Del. April 17, 2025) (noting that PCT fails to sufficiently identify the recipients of the transfers); Mem. Law Defs. Plutus Financial Inc. d/b/a Abra and Plutus Lending LLC Supp. Mot. Dismiss at 6–10, *PCT Litigation Trust v. Plutus Financial Inc.*, No. 25-50960 (Bankr. D. Del. Aug. 4, 2025) (same); Def. CyberSteward, Inc.'s Mem. Law Supp. Mot. Dismiss ¶ 28, *PCT Litigation Trust v. CyberSteward, Inc.*, No. 25-51050 (Bankr. D. Del. Oct. 2, 2025) (the complaint "does not explain where the funds were transferred").

for Zap's benefit; (c) offers no factual allegations to support its conclusory allegation that Zap was a creditor with respect to the Alleged Transfers, a conclusion that is refuted by the terms of the PT-Zap Agreements (defined below) on which the Complaint relies; and (d) alleges no facts to support the conclusion that the Alleged Transfers were made on account of antecedent debt owed to Zap.[17] Because the Complaint thus contains inadequate factual allegations showing that the Alleged Transfers were made "to" or "for the benefit" of a "creditor" on account of "antecedent debt," it does not state a plausible preference claim and must be dismissed.

## BACKGROUND

### A.  Prime Trust Business Operations

Prime Trust was founded in 2016 as a trust and custodial services company.[18] It originally focused on providing custodial services for Fiat and other traditional assets. Following the growth of the cryptocurrency industry, the company shifted its focus to providing custodial services for cryptocurrency and other digital assets (in addition to Fiat).[19] Prime Trust's bundle of services, which it provided directly to both integrators and their customers, included:

>   (a) **Custodial Services**, where Prime Trust stored customers' Fiat and cryptocurrency;
>
>   (b) **Cryptocurrency Liquidity Services**, through which Prime Trust facilitated the purchase or sale of cryptocurrencies by its customers from or to different cryptocurrency liquidity providers, with immediate or T+1 settlement of transactions;
>
>   (c) **Settlement Services**, pursuant to which Prime Trust facilitated the transfer of Fiat or digital assets between customer accounts on its network; and
>
>   (d) **Money Transmission Services**, including access to a network of banking rails (*i.e.*, payment rails through which money can be transferred from one

---

[17]    *See infra*, Argument, Section B.

[18]    *See* Compl., ¶ 52; Law Decl., ¶ 8.

[19]    *See* Compl., ¶ 53; Law Decl., ¶ 8.

party to another), including through ACH, debit cards, credit cards and wire transfers.[20]

With this suite of services, Prime Trust acted as a custodian, cryptocurrency exchange, and broker of sorts with respect to the financial assets bought, sold and deposited by customers on its platform (the "PT Platform").

## B.  Zap's Business and Role as Integrator

Zap is a technology company founded in 2019 to provide, through its Strike mobile application, various financial services (including the ability to engage in BTC transactions) to customers within the United States.[21] Early in its existence, Zap entered into agreements with Prime Trust under which Prime Trust would, among other things, (a) transmit money using its status as a regulated state-chartered trust company; (b) facilitate trading of BTC through its liquidity and settlement services; and (c) provide custodial services to Zap's customers for their Fiat and BTC.[22] The Strike application allowed Zap customers to interface with the PT Platform so they could buy, sell, and store BTC on the PT Platform efficiently for their own accounts.[23] Zap acted, at most, as an intermediary and facilitator for its customers as they engaged in transactions involving Fiat and BTC custodied on the PT Platform.[24]

---

[20]     *See* Law Decl., ¶¶ 13–21.

[21]     *See* Compl., ¶¶ 6, 33.

[22]     *See* Compl., ¶¶ 7, 57, 64.

[23]     *See, e.g.*, Compl., Ex. B, Service Schedule for Prime Trust Settlement and Liquidity Services, § 4.3 ("Prime Trust will execute all End User bitcoin buy and sell orders placed by End Users at the quoted price agreed to by Prime Trust. . . .").

[24]     *See id*; Compl., Ex. B, Prime Trust Master Services Agreement, § 1 "Transactions" (defining "Transactions" as "any transactions that [Zap] facilitates using Prime Trust Services with End Users"); Compl., Ex. B, Service Schedule for Prime Trust Settlement and Liquidity Services, § 4.5 ("The Parties agree that [Zap] is passing through instructions from [its customers] to Prime Trust to facilitate the purchase, sale, contribution, or distribution of bitcoin by [customers]."

## C. Zap-Prime Trust Contracts

Zap first contracted with Prime Trust for custody, liquidity, compliance, and related services in 2019.[25] In August 2022, Prime Trust and Zap entered into new agreements that superseded and replaced their prior agreements.[26] These agreements included, among others: (a) the Prime Trust Master Services Agreement, dated August 16, 2022 ("MSA"); (b) the Service Schedule for Prime Trust Custodial Services ("Custodial Agreement"); (c) the Service Schedules for the (i) Prime Trust Settlement and Liquidity Services; (ii) Prime Trust API Services; and (iii) Prime Trust Compliance Services; (d) the ACH Service Attachment for Prime Trust API Services ("ACH Service Attachment"); (e) the Prime Trust Order Form, dated August 16, 2022 (as amended, "PT Order Form"); and (f) the Fee Schedule ("PT-Zap Agreements").[27] Zap's customers also entered into certain End User Agreements with Prime Trust, which governed their independent contractual relationships with Prime Trust.[28]

The Custodial Agreement states that all Custodial Property held by Prime Trust remained the property of the customer. Section 2.9 of the Custodial Agreement confirms that:

> Ownership of Custodial Property. Customer owns all Custodial Property [Fiat and BTC] held by Prime Trust on behalf of Customer in accordance with this Service Schedule. Customer's Custodial Property will not be reflected on Prime Trust's balance sheet as assets of Prime Trust. Prime Trust may, for convenience, take and hold title to Custodial Property or any part thereof in its own name with Customer's ownership of Custodial Property segregated on Prime Trust's books and records.

---

[25]     *See* Compl., ¶ 7.

[26]     *See* Compl., ¶ 8.

[27]     These agreements are annexed to the Complaint as Exhibit B and, therefore, are part of the Complaint under Bankruptcy Rule 7010. *See* Compl., Ex. B.

[28]     *See* MSA, at A-4 (defining "End User"); *id.*, § 2.4.

9

Prime Trust further agreed to (a) deposit any custodied Fiat in FDIC insured bank accounts that were to be held *for the benefit of* Prime Trust customers[29] and (b) "custody the Digital Assets in Customer's name or in Customer Custody Accounts established for the benefit of Customer."[30]

These provisions are consistent with industry practice, where money transmitters often maintain customer funds in custodial accounts titled in the money transmitter's name "for the benefit of" or "FBO" their customers. Funds in such "FBO" accounts are understood by the banks holding them, and by regulators, to be funds beneficially owned by the money transmitters' customers, *not* the licensed entity itself.[31]

Once Prime Trust had possession of Custodial Property, it could not exercise dominion and control over those assets or use those assets for its own purposes.[32] Notably, there are no provisions in the PT-Zap Agreements that allowed Prime Trust to use, sell, loan, or re-hypothecate Custodial Property provided to Prime Trust, as PCT claims exists in Prime Trust agreements with other customers.[33] On the contrary, Prime Trust could act with respect to Custodial Property only if a

---

[29]   *See* Custodial Agreement, § 2.7 ("Prime Trust must (a) deposit any cash or Fiat Currency funds deposited by Customer with Prime Trust, . . . into deposit accounts at Federal Deposit Insurance Corporation ("FDIC") insured, regulated depository institutions selected by Prime Trust, which accounts will be held *for the benefit of Prime Trust customers*. . . .") (emphasis added); *see also* ACH Service Attachment, § 12 ("Customer's fiat currency will be held, and transactions processed through, a settlement account we hold at such FDIC-insured bank *for the benefit of our customers or users*.") (emphasis added).

[30]   Custodial Agreement, § 2.4.

[31]   *See, e.g.*, Federal Deposit Ins. Corp., Recordkeeping for Custodial Accounts, 89 Fed. Reg. 80135, at 80140–41 (Oct. 2, 2024) (distinguishing "beneficial owners" of such accounts from the "account holder").

[32]   *See* PT Order Form, ¶ 3 ("Notwithstanding any agreement between Prime Trust and an End User to the contrary, Prime Trust will not invest or otherwise use bitcoin that it holds in custody for End Users.").

[33]   *Compare* PT-Zap Agreements *with* Distribution Opinion, at 4–5, 24–25.

10

customer directed or authorized that action.[34]

To underline that Zap and its customers would retain ownership of all property entrusted to Prime Trust, the parties elected to have Article 8 govern their relationship, agreeing that:

> Customer is an "Entitlement Holder" in a "Financial Asset," as defined by, and for purposes of the Uniform Commercial Code, including Article 8 thereto, as adopted and implemented in accordance with Nevada law ("UCC"). Applicable Custodial Property are "Financial Assets" for purposes of the UCC and are not assets of Prime Trust.[35]
>
> ***
>
> APPLICATION OF UCC. Except as otherwise provided under Applicable Law, the Parties agree the relationship between Prime Trust and Customer is governed by Article 8 of the UCC and that for the purposes of this Service Schedule: Customer is an "entitlement holder" and any Custodial Property will be treated as a "Financial Asset" within the meaning of Nevada Revised Statutes ("NRS") 104.8102(h) and (j).[36]

These provisions are not "isolated reference[s]," as PCT alleges,[37] but bedrock contractual obligations that make clear that customers retain ownership of all custodial property deposited with Prime Trust pursuant to the PT-Zap Agreements.

The Parties adopted Article 8 to ensure that customers would retain their property interests in assets deposited with Prime Trust. Revised Article 8 was promulgated to address the precise circumstances here, where customers (known as entitlement holders) deliver financial assets to a custodian (referred to as a securities or financial intermediary) for safekeeping and custody on the custodian's platform or exchange, where they are commingled and held together with like financial assets of the intermediary or its other customers. The indirect holding system that underlies modern

---

[34]     *See* Custodial Agreement, § 2.3(b) ("In providing the Custodial Services, Prime Trust will act *only* upon receipt of any direction, instruction or request submitted by an Authorized Person or through the Customer's platform (an 'Authorized Instruction').") (emphasis added).

[35]     Custodial Agreement, § 3.1(a).

[36]     *Id.*, § 6.

[37]     Compl., ¶ 68.

11

financial markets, as reflected in Article 8, is premised on the commingling and bulk custody of financial assets by an intermediary.[38] To protect the investors who hold assets indirectly in this system, Article 8 makes clear that entitlement holders retain beneficial ownership of the financial assets held by a securities intermediary; such assets are *not* property of the securities intermediary and are *not* reachable by its creditors notwithstanding commingling.[39]

## D.  Prime Trust Chapter 11 Filing

Prime Trust filed for chapter 11 relief on August 14, 2023. Jor Law, the Interim Chief Executive Officer and President of Prime Trust, attributed the need for chapter 11 relief to several factors, including (a) certain liquidity events that occurred in the cryptocurrency market; (b) Prime Trust's excessive expenditures, imprudent investments, and resulting losses; and (c) the gross negligence and subsequent fraud committed by Prime Trust management in connection with the 98f Wallet, which resulted in the loss of tens of millions of dollars in cryptocurrency[40] as well as a cease and desist order precluding Prime Trust from further engagement in trust company business and the appointment of a receiver for Prime Trust.[41]

**LEGAL STANDARD FOR DISMISSAL**

To survive a motion to dismiss under Bankruptcy Rule 7012(b)(6), PCT must state a claim for relief that is "plausible on its face." *Edney v. Haliburton*, 658 F. App'x 164, 166 (3d Cir. 2016) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To state a plausible preference

---

[38]     *See* UCC § 8-504, cmt. 1 ("Securities firms typically keep all securities in fungible form, and may maintain their inventory of a particular security in various locations and forms, including . . . book entry positions. . . . ").

[39]     *See* UCC § 8-503, cmt. 1 ("[S]ecurities that a [securities intermediary] holds for its customers are not general assets of the firm subject to the claims of creditors.").

[40]     *See* Compl., ¶ 24; Law Decl., at 21 n.25.

[41]     *See* Law Decl., ¶¶ 57–59.

12

claim, a plaintiff must plead sufficient facts from which the Court can "draw the reasonable inference that the defendant" received preferential transfers of a debtor's interests in property. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Courts in the Third Circuit apply a three-step process to determine whether a complaint states a plausible claim for relief. *See Lutz v. Portfolio Recovery Assocs., LLC*, 49 F.4th 323, 327 (3d Cir. 2022). *First*, the Court must identify the elements that must be pled to state a claim. *Id*. *Second*, the Court must review the complaint and disregard all conclusory allegations, including "formulaic recitation[s] of the elements of a claim or other legal conclusion, as well as allegations that are so threadbare or speculative that they fail to cross the line between the conclusory and the factual." *Id.* at 327–28. *Third*, the Court must "evaluate[ ] the plausibility of the remaining allegations." *Id.* at 328. Where "a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (citation omitted).

In deciding a motion to dismiss, the Court may consider (a) factual allegations in the complaint; (b) exhibits attached to the complaint; (c) matters of public record or with respect to which a court can take judicial notice; and (d) any undisputedly authentic documents if the complainant's claims are based upon these documents. *See Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). The Court should not accept as true allegations that are inconsistent with such documents. *See Miller v. Easy Star Records (In re DA Liquidating Corp.)*, 622 B.R. 172, 176-77 (Bankr. D. Del. 2020) (dismissing complaint because contracts contradicted trustee's allegations that defendant was a creditor of debtor); *James Cable, LLC v. Millennium Digital Media Sys., LLC (In re Broadstripe, LLC)*, 435 B.R. 245, 254 n.31 (Bankr. D. Del. 2010) ("[I]f the allegations of

13

[the] complaint are contradicted by documents made a part thereof, the document controls and the Court need not accept as true the allegations of the complaint.").

## ARGUMENT

To survive a motion to dismiss a preference claim, a complaint must contain sufficient factual allegations to support each of the elements set forth in section 547(b) of the Bankruptcy Code. Notably, a plaintiff must include factual allegations showing that the challenged transfers were (a) transfers of a debtor's interest in property; (b) made to or for the benefit of a creditor; and (c) made in payment of antecedent debt.[42] As demonstrated below, the Complaint does not adequately allege facts supporting any of these essential elements.

## A.  The Alleged Transfers Were Not Transfers of Prime Trust's Property.

The parties elected to have their custodial relationship governed by Article 8. Under Article 8, financial assets held in custody by a securities intermediary (Prime Trust) are *not* the intermediary's property and are beyond the reach of its creditors. The analysis is straightforward and dispositive, as reflected in the four points set forth below:

- **Point A.1** establishes that Article 8, adopted by Nevada, defines Prime Trust's property interests;

- **Point A.2** addresses each of Article 8's four operative definitions—financial asset, securities account, securities intermediary, and entitlement holder—and explains why each applies to the parties' relationship;

- **Point A.3** explains that commingling is a key characteristic of the relationship that Article 8 is designed to govern and does not deprive customers of their ownership of custodial property; and

- **Point A.4** distinguishes the Court's Distribution Opinion, which addresses common-law trust principles and not the Article 8 election.

As this four-part analysis explains, the custodial assets at issue belonged to Zap or Zap's

---

[42]        11 U.S.C. § 547(b)(1) and (2) (emphasis added).

14

customers, *not* Prime Trust. The transfer of these assets back to Zap or its customers thus was not a transfer of the debtor's interest in property, as required to state a preference claim.

    1.  *Article 8 Defines Prime Trust and Zap's Rights in Custodial Property.*

Under well-established law, the scope and nature of the interests of a debtor in property are determined by state law. *See Butner v. United States*, 440 U.S. 48, 54 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law."); *Hall v. Ford Motor Credit (In re JKJ Chevrolet, Inc.)*, 412 F.3d 545, 550 (4th Cir. 2005) (applying UCC § 9-306(4), rather than traditional tracing test, to determine the extent of a secured creditor's security interests in commingled funds). Here, Prime Trust and Zap selected Nevada as the governing law under the PT-Zap Agreements and specified that Article 8 of the Nevada UCC would govern the nature of their relationship.[43] Prime Trust's bankruptcy filing does not change the result of the parties' election. *See In re Messina*, 687 F.3d 74, 82 (3d Cir. 2012) ("Filing for bankruptcy does not create new property rights or value where there previously were none.").

    2.  *The Parties' Relationship Meets the Requirements of Article 8.*

By electing to treat Custodial Property in accordance with Article 8,[44] the Custodial Agreement brings into play an interlocking set of terms—"financial asset," "securities intermediary," "securities account," and "entitlement holder"—that define the parties' commercial relationship and their rights with respect to Custodial Property. These definitional elements drive the Article 8 analysis: (a) the property must be a "financial asset," (b) the financial asset must be (i) credited to a "securities account" by (ii) a "securities intermediary" for (c) an "entitlement

---

[43]    *See* Compl., ¶ 62 (citing MSA § 13.1 ("The Agreement is governed by and will be interpreted and enforced in accordance with the laws of the State of Nevada without regard to principles of conflict of laws.")); Custodial Agreement, § 6 (providing that the parties' relationship is "governed by Article 8").

[44]    The determination of rights under Article 8 is largely a matter of contract interpretation.

15

holder." If these elements (discussed below) are met, Article 8's protective rules apply automatically. By operation of law, the customer is an entitlement holder with statutory property rights to the financial assets held by the intermediary, and the financial assets are not the intermediary's property.

      a.   Prime Trust and Zap Elected to Treat All Custodial
            Property as "Financial Assets" Subject to Article 8.

Under Article 8, a "financial asset" includes "any property that is held by a securities intermediary for another person in a securities account if the securities intermediary has *expressly agreed* with the other person that the property is to be treated as a financial asset."[45] Here, there is no question that the property at issue was a "financial asset." The parties expressly agreed to designate Custodial Property—"any property delivered by Customer into the possession or control of Prime Trust"[46]—as a "financial asset" under Article 8.[47]

The fact that the financial assets entrusted to Prime Trust were BTC and Fiat, rather than more traditional financial assets such as stocks and bonds, does not preclude Article 8's application. Indeed, the election mechanism under Article 8 is purposely "worded in general terms" in order to "cover the wide variety of investment products that now exist or may develop."[48] As the drafters explained, "parties [may] agree to treat a digital asset as a financial asset" and a

---

[45]     NRS § 104.8102(1)(j)(3) (emphasis added).

[46]     Custodial Agreement, § 1; *see also id.*, § 2.2 ("Custodial Property that Prime Trust may agree to accept and hold on Customer's behalf" includes "Digital Assets" and "Fiat Currencies.").

[47]     *See* Custodial Agreement, § 6 ("[T]he Parties agree the relationship between Prime Trust and Customer is governed by Article 8 . . . and any Custodial Property will be treated as a 'Financial Asset'").

[48]     UCC § 8-103, cmt. 1; *see also Flener v. Alexander (In re Alexander)*, 429 B.R. 876, 879 (Bankr. W.D. Ky. 2010), *aff'd*, 2011 WL 9961118 (6th Cir. Dec. 14, 2011) (treating a bank certificate of deposit as a financial asset credited to a securities account); *Wells Fargo Bank, N.A. v. Estate of Malkin*, 278 A.3d 53, 66 (Del. 2022) (treating an insurance policy as a financial asset credited to a securities account).

"controllable electronic record may [also] be a 'financial asset'" under Article 8.[49] Article 8's plain and broad terms also permit parties to agree to treat cash as a financial asset.[50] Here, the PT-Zap Agreements do just that and conclusively establish that Custodial Property, including BTC and Fiat, received from Zap or Zap's customers was a financial asset under Article 8.[51]

      b.  Prime Trust Maintained "Securities Accounts" as a "Securities Intermediary."

A "securities intermediary" under Article 8 is any party that in the ordinary course of its business maintains securities accounts for others and acts in that capacity.[52] Securities intermediaries are not fiduciaries or trustees charged with making decisions about customer assets; they are custodians who hold assets subject to customers' directions.[53] Although brokers and banks are the most common examples of securities intermediaries, a custodian like Prime Trust "that holds only cryptocurrencies (and not securities) for customers" can be a securities intermediary.[54] The "ordinary course of business" requirement does not require that securities accounts make up a particular quantum of the intermediary's business.[55] In fact, an entity may be a securities intermediary as to certain arrangements, even if it acts in "many different capacities."[56]

---

[49]    *See* UCC § 8-102, cmt. 9 (digital assets can be a financial asset); *id.*, cmt. 18 (controllable electronic records can be a financial asset).

[50]    *See* Jeanne L. Schroeder, *Is Article 8 Finally Ready This Time? The Radical Reform of Secured Lending on Wall Street*, 1994 Colum. Bus. L. Rev. 291, 415 n.297 (1994) ("[I]f a [securities intermediary] so agreed, 'cash' held for a customer could be a financial asset, and the customer's rights in the cash could be a securities entitlement.").

[51]    *See* Custodial Agreement, § 6 ("[A]ny Custodial Property will be treated as a 'Financial Asset' within the meaning of [Article 8]").

[52]    *See* UCC § 8-102, cmt. 14; *see also* NRS § 104.8102(1)(m).

[53]    *See* Schroeder *supra*, note 50, at 363 n.176 (contrasting a "financial intermediary," such as a custodian, with "a fiduciary" such as a "trustee or escrow agent").

[54]    UCC § 8-102, cmt. 14.

[55]    *Id.* ("[A] person need not necessarily satisfy a specified threshold of activity or necessarily have a minimum number of customers.").

[56]    *Id.*

A securities account is created when a securities intermediary "*agree[s]*" to maintain an account to which a "financial asset" "is or may be credited" and "*undertakes*"[57] in that agreement to treat the customer "as entitled to exercise the rights that comprise the financial asset"[58]—that is, when it agrees to treat the customer as an "entitlement holder." *See* NRS § 104.8102(1)(h); UCC § 8-501, cmt. 1 (a securities account arises when the intermediary has "undertaken to treat the other persons as entitled to exercise the ordinary rights of an entitlement holder").

Prime Trust created Article 8 securities accounts by agreeing in the Custodial Agreement to hold customer assets in "Custody Accounts established for the benefit of Customer" and to treat Zap as an Article 8 "Entitlement Holder" with respect to these "Financial Assets."[59]

Notably, PCT's own allegations confirm that Prime Trust not only agreed to maintain—but in fact maintained—accounts to which customers' financial assets were credited. As PCT admits in the Complaint, Prime Trust offered "custodial services"[60] and credited assets to Zap's and Zap's customers' accounts by ledger entry. "Prime's customers were provided with deposit digital wallet addresses" and Prime Trust tracked the Fiat and crypto transferred by its customers by use of an internal, omnibus ledger.[61] When a customer transferred cryptocurrency to Prime Trust, "Prime would credit that amount on the Internal Ledger," and when a customer requested an outgoing transfer, "Prime would check the Internal Ledger to determine if the customer's

---

[57]    To "undertake" means "to put oneself under obligation to perform." *See Undertaking*, Merriam-Webster, https://www.merriam-webster.com/dictionary/undertake; *see also Undertaking*, *Black's Law Dictionary* (12th ed. 2024) ("The act of someone who agrees to engage or actually engages in a project or business; a promise, pledge, or engagement.").

[58]    NRS § 104.8501(1) (emphases added).

[59]    Custodial Agreement, § 2.4; *see id.*, § 3.1(a) ("Customer is an 'Entitlement Holder' in a 'Financial Asset,' as defined by, and for purposes of, the Uniform Commercial Code, including Article 8 thereto. . . .").

[60]    Compl., ¶ 52.

[61]    Compl., ¶¶ 126, 195.

18

reported crypto balance was sufficient."[62] An account to which financial assets are credited by book entry is the functional description of a "securities account" under Article 8.[63]

Prime Trust easily qualifies as a securities intermediary based on the face of the Complaint, which illustrates that Prime Trust maintained these securities accounts for Zap and its customers "in the ordinary course of its business."[64] The custodial business that Prime Trust had with Zap and its customers was projected to account for "13% of Prime's total revenue."[65] And Prime Trust's own filings state that it offered similar services as custodian of digital assets and cash for other customers.[66] The "sample Custodial Agreement" and "End-User Agreement" governing Prime Trust's relationship with its other customers, also included an Article 8 election.[67] There is no question that Prime Trust acted as a securities intermediary in the ordinary course.

The structure of the PT-Zap Agreements also reinforces the conclusion that Prime Trust was a securities intermediary. The agreements treated customers, not Prime Trust, as the persons

---

[62]     *See* Compl., ¶¶ 195, 198–99. Although PCT alleges that Prime Trust's ledger cannot be relied upon to trace financial assets (Compl., ¶ 25), it does not allege (nor could it) that the ledger cannot be relied upon to determine the amount of financial assets deposited and withdrawn by its customers. On the contrary, PCT acknowledges that Prime Trust recorded Zap's transactions in Prime Trust's ledger. *Id.*, ¶ 126 ("Zap's transactions were recorded in Prime's Internal Ledger under internal account names. . . .").

[63]     *See* NRS § 104.8501(1).

[64]     *See* NRS § 104.8102(1)(m).

[65]     Compl., ¶ 61.

[66]     *See, e.g.,* Law Decl., ¶ 10 (Prime Trust "provid[ed] critical infrastructure to notable companies[,]" including "wealth management platforms . . . cryptocurrency IRAs" and "digital asset custodial services for RIAs . . . In some cases, [Prime Trust] provided almost all of the infrastructure for companies, opening accounts for not only those companies, but each of their respective customers . . . processing transactions through [Prime Trust'] liquidity APIs, and storing their customers' fiat currency and cryptocurrency."); *id.*, ¶ 11 ("By the end of 2021," Prime Trust "had opened 2.8 million new custodial accounts, held over $3.8 billion in cryptocurrency and fiat currency assets under custody, and facilitated over $309 billion USD of fiat currency movement.").

[67]     *See* Declaration of David Dunn in Support of the Distribution Motion [D.I. 920] at 3 n.5–6; *id.* Ex. 2; *id.* Ex. 3.

"entitled to exercise the rights that comprise the financial asset."[68] Consistent with Article 8, the PT-Zap Agreements confirm that Prime Trust did not own the Custodial Property.[69] Rather, Prime Trust received Custodial Property as a custodian[70] and was authorized to act with respect to such property only at the direction of its customers.[71] This custodial arrangement is exactly the relationship that Article 8 was designed to govern.[72]

> c. The Complaint Confirms that Zap and its Customers are "Entitlement Holders" Under Article 8.

An "entitlement holder" is anyone that has "acquire[d] a security entitlement,"[73] *i.e.*, the set of "rights and property interest[s]" a customer holds in a financial asset under part 5 of Article 8.[74] A customer acquires a security entitlement when the intermediary "[i]ndicates by book entry that a financial asset has been credited to his or her securities account" or "[r]eceives a financial asset from the person" and "accepts it for credit to his or her securities account." [75] In addition to the express terms of the contract, wherein Prime Trust agreed that Zap was an "Entitlement Holder" in a "Financial Asset," PCT's own allegations confirm that Zap is an entitlement holder

---

[68] NRS § 104.8501(1).

[69] *See* Custodial Agreement, § 2.9 ("Customer owns all Custodial Property held by Prime Trust on behalf of Customer in accordance with this Service Schedule."); *id.*, § 3.1(a) ("Custodial Property are Financial Assets . . . and are not assets of Prime Trust.").

[70] *See id.*, § 2.3(b) (Prime Trust would "act only upon receipt of any direction, instruction, or request" submitted by a customer or authorized person); and § 2.3(g) ("Prime Trust will hold the proceeds of such transaction(s) [in Custodial Property] until receipt of an Authorized Instruction."); *see also* PT Order Form, ¶ 3 ("Prime Trust will not invest or otherwise use bitcoin that it holds in custody").

[71] *Compare* Custodial Agreement § 2.3(b) ("In providing the Custodial Services, Prime Trust will act only upon receipt of any direction, instruction, or request submitted by an Authorized Person or through the Customer's platform") *with* NRS § 104.8507 (a securities intermediary is obligated to comply with entitlement orders).

[72] *See* Rogers *supra*, note 7, at 1495 ("[T]he indirect holding system rules in Revised Article 8 come into play only with respect to the custodial function.").

[73] NRS § 104.8102(1)(h).

[74] NRS § 104.8102(1)(p).

[75] NRS § 104.8501(2).

20

under Article 8. As explained above, PCT admits that Prime Trust credited on its ledger the financial assets deposited, withdrawn and transferred.[76] In doing so, Prime Trust created and maintained securities entitlements for Zap and its customers as entitlement holders.[77]

In the Complaint, PCT suggests that Article 8 does not apply because Prime Trust failed to comply with the so-called "perfect match" requirement: an intermediary's duty under Article 8 to maintain financial assets in a sufficient quantity to satisfy all securities entitlements.[78] But the fact that an intermediary breaches its Article 8 obligations does not mean it ceases to be an intermediary, or that it acquires a right to its customers' property. As the commentary confirms, "whether a person acquire[s] a security entitlement does not depend on whether the intermediary has complied with [its perfect match] duty."[79] A contrary rule would render Article 8 meaningless, stripping entitlement holders of the statute's protections any time a securities intermediary failed to fulfill its duties. Zap and its customers thus maintained their property interests regardless of Prime Trust's breach of its obligations.

3. *Under Article 8, the Financial Assets Custodied with Prime Trust Were Not Its Property Regardless of Commingling.*

Despite PCT's allegations,[80] commingling does not defeat entitlement holder status under Article 8. Commingling is not an exception that swallows the rule that customers retain ownership of custodial property, but the operational reality the rule was written to govern. Article 8's entire architecture was built to govern relationships in which financial assets are held in fungible bulk, commingled with the intermediary's own assets and the assets of other customers. Despite such

---

[76]   *See* Compl., ¶¶ 195, 198–99.

[77]   *See* NRS §§ 104.8102(1)(i) and 104.8501(2)(a).

[78]   Compl., ¶¶ 70–75; *see also* NRS § 104.8504.

[79]   UCC § 8-501, cmt. 3.

[80]   *See* Compl., ¶¶ 75, 79, 250–255.

21

commingling, financial assets that a securities intermediary holds for its customers "are not property of the securities intermediary and are not subject to claims of creditors of the securities intermediary."[81] In the event of a shortfall, entitlement holders retain a pro rata property interest in "*all* units" of that financial asset held by the securities intermediary.[82] Segregation and tracing are not required to assert that interest and protect their own assets from those of an intermediary's general creditors.

Indeed, Article 8 assumes that custodians will commingle customer assets with their own assets of the same type. That is the basic premise of the indirect holding system the statute was designed to support.[83] Article 8 recognizes that financial assets will be held in "fungible bulk," such that it "is not possible to identify particular [financial assets] as belonging to customers as distinguished from other particular [financial assets] that are the firm's own property."[84] Accordingly, Article 8 creates a property interest not in a "specific identifiable thing" that must be "traced," but in "a package of rights and interests that a person has against the person's securities intermediary and the property held by the intermediary."[85] When a customer exercises its rights to withdraw its property from the intermediary's custody, it is not transferring property in which the

---

[81]    NRS § 104.8503(1).

[82]    UCC § 8-503, cmt. 1; *see* NRS § 104.8503(2). As the reporter of the committee that drafted Part 5 has explained, when an intermediary has a "shortfall in the shares of XYZ Co. stock to satisfy the claims of customers of [the intermediary] who held XYZ Co. stock," "the entitlement holders [have] a pro rata property interest in all shares of XYZ Co. stock held by Firm A." Rogers *supra* note 7, at 1520, 1521; *see id.* at 1518 ("[A]ll units of a particular financial asset that are held by an intermediary are subject to this first priority claim of the intermediary's entitlement holders.").

[83]    *See* Rogers *supra*, note 7, at 1518; Russell A. Hakes, *UCC Article 8: Will the Indirect Holding of Securities Survive the Light of Day*, 35 Loy. L.A. L. Rev. 661, 777, n.622 (2002) ("Securities intermediaries in practice commingle customer securities with their own.").

[84]    UCC § 8-504, cmt. 1; *id.* § 8-503, cmt. 1 ("[S]ecurities intermediaries generally do not segregate securities in such fashion that one could identify particular securities as the ones held for customers . . . .").

[85]    UCC § 8-503, cmt. 2 (noting that tracing "has no place in the Revised Article 8").

intermediary has rights. Because Article 8 provides that the financial assets held by a custodian and securities intermediary (here, Prime Trust) are not the intermediary's property, the Alleged Transfers were not transfers of any interest in property belonging to Prime Trust.

    4.  *Application of Article 8 is not Contrary to the Distribution Opinion.*

The conclusion that the Alleged Transfers did not involve the transfer of an interest in property of Prime Trust does not conflict with the Distribution Opinion [D.I. 1086]. First, this Court specifically held, "[b]y agreement of the parties," that Zap's rights were "not . . . adjudicated" by the Distribution Opinion.[86] The Distribution Opinion and its determination regarding "property of the Debtors' Estates" thus did not apply to Zap,[87] and PCT concedes that the Distribution Opinion is "not binding on Zap."[88]

The Distribution Opinion also did not address Article 8 because no party raised it. The Court instead applied common-law trust principles, which—unlike Article 8—require a "trust recipient" to identify and trace the trust funds.[89] To show that assets paid from a commingled account were not property of the estate, a putative "trust recipient" must generally "identify and trace the trust funds."[90] But Article 8 displaces the common law on this point.

The property rights created by Article 8 are not "governed by ordinary trust law."[91] "Unlike a common-law trust, in which the settlor sets aside particular *property* as the trust res,"[92] Article 8

---

[86]    Distribution Opinion [D.I. 1085], at 2 n.5.

[87]    Distribution Order [D.I. 1086], at 2–3 ("The foregoing order, adjudication, and decree in Paragraph 2 shall not apply to any Currency allegedly transferred by, to or for the benefit of the Reserved Parties."); Distribution Opinion 2 n.5 (defining "Reserved Parties" to include Zap).

[88]    Compl., ¶ 13 n.8.

[89]    Distribution Opinion, at 23–30.

[90]    *City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95 (3d Cir. 1994).

[91]    UCC, Art. 8, Prefatory Note, III.C.5 (2025).

[92]    *Begier v. I.R.S.*, 496 U.S. 53, 62 (1990).

23

creates a "a sui generis form of property interest in the assets held by the intermediary."[93] Tracing specific interests in particular property has no role in determining property rights under this statutory regime: "[t]he idea that discrete objects might be traced through the hands of different persons has no place in the Article 8 rules for the indirect holding system."[94] The Court's determination that assets held by Prime Trust were "hopelessly commingled" is thus not applicable or relevant to the analysis of the property rights of Prime Trust and its customers under Article 8.

The Court thus can and should hold that Zap and its customers retained property rights in the financial assets held by Prime Trust, consistent with Article 8. To hold otherwise would undermine confidence in the modern system of indirect holding of financial assets, by ignoring the critical foundational principle that, when customers hold financial assets through an intermediary, they "do not take the credit risk of their intermediary."[95]

***

Sophisticated commercial parties make Article 8 elections in reliance on a settled bargain: that when they provide financial assets to an intermediary, their assets will not become property of the intermediary's estate if the intermediary fails. If that bargain can be set aside whenever an asset class is unfamiliar or where the intermediary's conduct was troubling, Article 8's protections would evaporate at the moment they are needed most.[96] Zap and Prime Trust made an Article 8 election. The Court should enforce it by dismissing PCT's claims with prejudice.

---

[93] Rogers *supra*, note 7, at 1518; NRS § 104.8501(1)–(2); UCC § 8-503, cmt. 2.

[94] UCC § 8-503, cmt. 2.

[95] Rogers *supra*, note 7, at 1517; UCC § 8-503, cmt. 1 ("[S]ecurities that a [securities intermediary] holds for its customers are not general assets of the firm subject to the claims of creditors.").

[96] *See* Rogers *supra*, note 7, at 1517 (A rule that treated customers' custodial positions "in the same fashion" as the claims of general creditors "would be entirely inconsistent with the expectations and ordinary understanding of the custodial relationship" and create "cause for alarm.").

24

**B. The Complaint Fails to Adequately Allege Other Required Elements of a Preference Claim**

*1. The Complaint Fails to Identify the Recipient of Each Transfer.*

The Complaint fails to adequately plead that Zap was a recipient, much less the transferee, of each Alleged Transfer. PCT's pleading of the transferee element is purely formulaic, repeatedly asserting that Prime Trust made transfers "to or for the benefit of" Zap without identifying, in each instance, *who* actually received the funds.[97] The API log data in Exhibits 4 and 5 to the Brennan Declaration is silent on the identity of the recipient for each of the Alleged Transfers. Exhibit 4, for example, omits the names of both the Prime Trust account holder and the name of the recipient of the Fiat transfer. Exhibit 5 similarly omits the name of the Prime Trust account holder and of the digital wallet holder that received the BTC transfer.

These omissions are all the more glaring given that PCT possesses detailed transaction data for each of the Alleged Transfers (API logs, account names and numbers, bank records, and blockchain analysis)[98] and claims that it can even identify the individual who directed a transfer.[99] Under well-settled law in this jurisdiction, PCT's failure to identify actual recipients of the Alleged Transfers—despite possessing the underlying data—requires that Counts I and II be dismissed. *See Miller v. Welke* (*In re United Tax Grp., LLC)*, 2016 WL 7235622, at *3 (Bankr. D. Del. Dec. 13, 2016) (dismissing complaint that failed to identify the transferee of each alleged transfer); *Claybrook v. Bear Growth Cap. Partners, LP (In re WBE, LLC)*, 2011 WL 2607090, at *4 (Bankr. D. Del. June 30, 2011) (same); *Insolvency Servs. Grp., Inc. v. Comcast Cable Commc'ns, LLC*, 2021 WL 4477000, at *5 (D. Del. Sep. 30, 2021) (dismissing claim because "Plaintiff fail[ed] to

---

[97]    *See, e.g.*, Compl., ¶¶ 2, 115, 122, 125.

[98]    *See* Compl., ¶ 26.

[99]    *See* Compl., ¶ 125.

25

state which of the[ ] payments went to Comcast and which went to the Doe defendants").

2.  *The Complaint is Devoid of any Factual Allegations Showing that the Alleged Transfers Were for Zap's Benefit.*

Section 547(b) and 550(a)(1) of the Bankruptcy Code also permit a plaintiff to avoid and recover[100] a preferential transfer from a party for whose benefit the transfer was made. To plead that theory, however, PCT must allege facts showing that Zap received an *actual, quantifiable, and accessible benefit* from the challenged transfers. *See In re FTX Trading Ltd.*, 676 B.R. 131, 140–41 (Bankr. D. Del. 2025). Notably, courts have found that a party has received a benefit from a preferential transfer only in narrow, well-defined circumstances—most commonly where: (a) a guarantor's liability is reduced or eliminated; (b) a direct debt owed to the defendant is paid down; or (c) a junior creditor's position is improved by the debtor's reduction of senior debt. *See Geller v. Coltec Indus., Inc. (In re Crucible Materials Corp.)*, 2012 WL 5360945, at *7 (Bankr. D. Del. Oct. 31, 2012) ("[C]ourts have held that a classic example of an 'entity for whose benefit a transfer was made' is a guarantor who receives a benefit but not the money."); *In re Compton Corp.*, 831 F.2d 586, 595 (5th Cir. 1987), *on reh'g*, 835 F.2d 584 (5th Cir. 1988) (beneficiary of letter of credit was the person for whose benefit the transfer was made); *In re Cardon Realty Corp.*, 146 B.R. 72, 79 (Bankr. W.D.N.Y. 1992) (assignee of loan qualified as person for whose benefit transfer was made); *Gladstone v. Bank of Am., N.A. (In re Vassau)*, 499 B.R. 864, 868 (Bankr. S.D. Cal. 2013) ("Junior Lienholder benefitted from the Transfers" because "the Transfers . . . increase[d] the equity in the Property available to secure the claim of Junior Lienholder."); 5 Collier on Bankruptcy ¶ 550.02[4] (16th ed. 2022). None of these circumstances are present here.

---

[100]  Section 550(a)(1) of the Bankruptcy Code requires a plaintiff to show and ultimately prove that a defendant was either an "an initial transferee" or "an entity for whose benefit the transfer was made" to recover an avoided preferential transfer.  *See* 11 U.S.C. §§ 547(b) and 550(a)(1). Because the Complaint fails to identify the recipient of each of the Alleged Transfers and does not contain any factual allegations explaining why the transfers were for Zap's benefit, both Counts I and II must be dismissed.

26

The Complaint fails to plead any actual, quantifiable, and accessible benefit received by Zap. Instead, PCT merely restates the statute—and nothing more—in charging Zap with having received the benefit of the transfers.[101] It nowhere explains what that benefit was, how it arose from the Alleged Transfers, or how Zap realized it. This is not sufficient to withstand a motion to dismiss.

3.   *The Complaint Fails to Allege Facts Showing Zap Was a Creditor.*

To survive a motion to dismiss a preference claim, a plaintiff must plead sufficient facts to plausibly show that a defendant held creditor status at the time of the transfer. *See Claybrook v. Consol. Foods, Inc. (In re Bake-Line Grp., LLC)*, 359 B.R. 566, 577 (Bankr. D. Del. 2007). The mere existence of a contractual relationship does not, without more, establish creditor status. *See In re BMT–NW Acquisition, LLC,* 582 B.R. 846, 861 (Bankr. D. Del. 2018) (referencing an agreement without alleging that the defendant advanced funds or performed services under that agreement fails to establish an antecedent debt).

Here, the Complaint alleges only that the PT-Zap Agreements created a debtor-creditor relationship between Prime Trust, as debtor, and Zap, as creditor.[102] Critically, the Complaint does not (and cannot) allege that Zap was owed any amounts under the PT-Zap Agreements—an essential requirement for establishing that a debt arose. Moreover, this conclusory allegation, made without any explanation or supporting factual allegations, is belied by provisions of the contracts. In fact, it was exactly the opposite. If a debtor-creditor relationship arose under the PT-Zap Agreements, then *Zap* was the debtor because it purchased custodial, liquidity and other services from Prime Trust. And Prime Trust was the creditor because it provided its services in

---

[101]   *See, e.g.*, Compl., ¶¶ 2, 26, 28, 30, 122.

[102]   *See* Compl., ¶¶ 11, 12 and 63.

exchange for established fees.[103] With respect to the Fiat and BTC that was custodied on the PT Platform by Zap or Zap's customers, no such debtor-creditor relationship was created: Zap was an entitlement holder, not a creditor.[104]

PCT's failure to allege facts to support its assertion that Zap was a creditor at the time of the Alleged Transfers—an assertion that, in any event, is belied by the terms of the PT-Zap Agreements—provides ample basis for dismissal of the Complaint. *See In re DA Liquidating Corp.*, 622 B.R. at 176–77 (dismissing complaint because underlying contracts contradicted trustee's conclusory allegation that defendant was a creditor of debtor).

4.   *The Complaint Fails to Plead That the Alleged Transfers*
     *Were Made on Account of Antecedent Debt.*

As noted earlier, a complaint must do more than recite the statutory element "for or on account of an antecedent debt." *See Lutz*, 49 F.4th at 327–28. The Complaint can only survive if it "identif[ies] the nature and amount of each antecedent debt," "details [the] relationship between the parties," and describes "how the transfers arose" from that relationship. *In re Tweeter Opco*, 452 B.R. 150, 155 (Bankr. D. Del. 2011) (dismissing complaint because it did not "explain the nature of the antecedent debt" that the transfers allegedly "satisfied"). Here, the Complaint offers the date and amounts of the Alleged Transfers but fails to tie any of those transfers to an antecedent debt allegedly owed to Zap. Specifically, the Complaint: (a) identifies no specific obligation of Prime Trust to Zap; (b) does not explain how any such debt arose or in what amount; (c) does not describe how liability was calculated under the PT-Zap Agreements; and (d) does not link any

---

[103]    *See* Compl., ¶ 64 ("The Order Form specified that Prime would provide certain services to Zap, including, but not limited to, API Services, compliance services, custodial services, payment rails and liquidity services."); MSA, §§ 6.1 (Fees), 6.3 (Late Charges), and 8.6 (Post-Termination Obligations; Order Form; Fee Schedule).

[104]    *See supra*, Section A (Article 8 discussion).

28

transfer to any particular obligation.

Courts in this district routinely dismiss complaints that fall short of this standard. *See, e.g.*, *In re DA Liquidating Corp.*, 622 B.R. at 176–77 (antecedent debt was insufficiently pled where complaint merely alleged defendant was a vendor and transfers were made for goods or services); *In re Liquid Holdings Grp., Inc.*, 2018 WL 6841351, at *3 (Bankr. D. Del. Nov. 14, 2018) (dismissing complaint that lacked any description of the parties' relationship or goods and services exchanged); *In re Quantum Foods, LLC*, 558 B.R. 111, 115 (Bankr. D. Del. 2016) (dismissing complaint that failed to describe the parties' relationship, nature of the debt, or underlying agreements); *In re Crucible Materials Corp.*, 2011 WL 2669113, at *4 (Bankr. D. Del. July 6, 2011) (listing check numbers, dates, and amounts is insufficient to establish a claim for relief absent explanation of the nature of the antecedent debt); *Stanziale v. DMJ Gas-Marketing Consultants, LLC (In re Tri-Valley Corp.)*, 2015 WL 110074, at *4 (Bankr. D. Del. Jan. 7, 2015) (dismissing complaint because, even if read together, the complaint and the exhibit attached thereto, "fail[ed] to allege sufficient facts detailing the nature of the alleged antecedent debt").

More fundamentally, PCT's theory of antecedent debt is legally flawed. As set forth above, under Article 8 of the UCC, the Alleged Transfers were not transfers of Prime Trust's property. Unlike a depository bank, a securities intermediary holds financial assets for customers who are not creditors, but rather entitlement holders.[105] The return of Fiat or BTC to Zap's customers (either directly or to Zap on behalf of its customers) was a return of another's property—not payment of an antecedent debt. A custodian returning a customer's own assets discharges no debt and does not deplete its own property; it restores property to its owner. *Cf. Begier*, 496 U.S. at 59,

---

[105]   *See* Rogers *supra*, note 7, at 1518 (explaining the distinction between an entitlement holder and a depositor of a bank).

29

66–67 (trustee could not avoid as a preference a payment of funds held in trust because debtor held no equitable interest in those funds); *Walsh v. Cobaugh (In re Riverside Supply, Inc.)*, 58 B.R. 661, 662–63 (Bankr. W.D. Pa. 1986) (return of advance deposit did not constitute a preference for failure to satisfy the antecedent debt element). Because PCT does not allege the Alleged Transfers were made on account of antecedent debt, the Complaint fails to state a claim upon which relief may be granted.

## CONCLUSION

For the reasons set forth above, Zap respectfully requests that this Court (a) dismiss the Complaint; and (b) grant such other relief as is just and appropriate.

Dated: May 18, 2026

**COLE SCHOTZ P.C.**

By:  */s/ Patrick J. Reilley*
  Patrick J. Reilley (No. 4451)
  Carol E. Thompson (No. 6936)
500 Delaware Avenue, Suite 600
Wilmington, DE 19801
Telephone:  (302) 652-3131
Facsimile:  (302) 652-3117

    -and-

**COVINGTON & BURLING LLP**
Dianne F. Coffino (admitted *pro hac vice*)
Mark P. Gimbel (admitted *pro hac vice*)
Martin E. Beeler (admitted *pro hac vice*)
Julia Blackburn (admitted *pro hac vice*)
30 Hudson Yards
New York, NY  10001
Telephone: (212) 841-1000
Facsimile:  (212) 841-1100

*Counsel for Zap Solutions, Inc.*

30